1  TRACY L. WILKISON
   Attorney for the United States,
2  Acting Under Authority Conferred
   by 28 U.S.C. § 515
3  BRANDON D. FOX
   Assistant United States Attorney
4  Chief, Criminal Division
   KAREN I. MEYER (Cal. Bar No. 220554)
5  Assistant United States Attorney
   Violent and Organized Crime Section
6       1300 United States Courthouse
        312 North Spring Street
7       Los Angeles, California 90012
        Telephone: (213) 894-8559
8       Facsimile: (213) 894-3713
        E-mail:    kim.meyer@usdoj.gov
9

10 Attorneys for Plaintiff
   UNITED STATES OF AMERICA

11

12              UNITED STATES DISTRICT COURT

13          FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 UNITED STATES OF AMERICA,           No. CR 15-701-ODW

15          Plaintiff,                 GOVERNMENT'S OPPOSITION TO
                                       DEFENDANT'S MOTION TO BE PLACED IN
16              v.                     HOME CONFINEMENT FOR THE REMAINDER
                                       OF HIS SENTENCE
17 JIM SHENG LEE,

18          Defendant.

19

20      Plaintiff United States of America, by and through its counsel

21 of record, the United States Attorney for the Central District of

22 California and Assistant United States Attorney Karen I. Meyer,

23 hereby files this opposition to defendant's motion to substitute

24 remaining sentence of imprisonment with home confinement pursuant to

25 18 U.S.C. § 3582.

26      This opposition is based upon the attached memorandum of points

27 and authorities, the files and records in this case, and such further

28 evidence and argument as the Court may permit.

1   Dated: April 20, 2020           Respectfully submitted,

2                                TRACY L. WILKISON
                                Attorney for the United States,

3                                Acting Under Authority Conferred
                               by 28 U.S.C. § 515

4

5                                BRANDON D. FOX
                               Assistant United States Attorney
                               Chief, Criminal Division

6

7                                    /s/
                               KAREN I. MEYER

8                                Assistant United States Attorney

9                                Attorneys for Plaintiff
                               UNITED STATES OF AMERICA

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

**TABLE OF CONTENTS**

DESCRIPTION                                                                PAGE

I.    INTRODUCTION...............................................1

II.   STATEMENT OF FACTS.........................................1

      A.    Defendant's Crimes and Sentence.......................1

      B.    Incarceration and Projected Release Date..............2

      C.    Defendant's Current Motion............................2

      D.    The Bureau of Prisons' and Congress's Response to
            COVID-19..............................................3

III.  ARGUMENT..................................................7

      A.    The Bureau of Prisons Has Sole Authority to Determine
            Placement Decisions...................................7

      B.    Defendant Has Failed to Satisfy the Exhaustion
            Requirement Found in 18 U.S.C. § 3582.................9

      C.    Defendant Should Serve His Full Sentence in Custody
            Given the Failure of a Previously Imposed Term of Home
            Confinement Did Not Prevent Defendant From Committing
            a New Crime and Any Condition Is Being Well-Managed
            While in Custody.....................................11

            1.    Defendant Has a Significant Criminal History,
                  Including a Term of Home Confinement that Did Not
                  Dissuade Him From Committing Crime.............11

            2.    Defendant's Condition Is Being Well-Managed.....12

IV.   CONCLUSION................................................13

1

**TABLE OF AUTHORITIES**

2

DESCRIPTION                                                                      PAGE(S)

3

**CASES**

4

Reeb v. Thomas,
          636 F.3d 1224 (9th Cir. 2011)....................................7

5

Shaw v. Bank of America Corp.,
6          946 F.3d 533 (9th Cir. 2019)....................................9

7   United States v. Grass,
          561 F. Supp. 2d 535 (E.D. Pa. 2008)............................7

8

United States v. Raia,
9          No. 20-1033,
          2020 WL 1647922 (3d Cir. Apr. 2, 2020)......................10

10

United States v. Weidenhamer,
11          No. CR16-01072-001-PHX-ROS,
          2019 WL 6050264 (D. Az. Nov. 8, 2019).........................9

12

**STATUTES**

13

18 U.S.C. § 3582(c)........................................1, 9, 11

14

18 U.S.C. § 3621(b)...........................................7

15

18 U.S.C. § 3622.............................................7

16

18 U.S.C. § 3624.............................................7

17

**OTHER AUTHORITIES**

18

Federal Bureau of Prisons Health Services Division, Pandemic
19          Influenza Plan---Module 1: Surveillance and Infection
          Control (Oct. 2012),
20          available at
          https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf........4

21

Federal Bureau of Prisons,
22          Correcting Myths About BOP and COVID-19,
          available at
23          https://www.bop.gov/coronavirus/docs/correcting_myths_and_
          misinformation_bop_covid19.pdf...............................6, 7

24

Federal Bureau of Prisons, Action Plan Phase V (Mar. 31, 2020),
25          available at
          https://www.bop.gov/resources/news/20200331_covid19_action_
26          plan_5.jsp...................................................4, 5

27

28

1 **TABLE OF AUTHORITIES (CONTINUED)**

2 DESCRIPTION                                                                    PAGE

3 Federal Bureau of Prisons, COVID-19 Action Plan: Agency-Wide
        Modified Operations (Mar. 13, 2020),
4       available at
        https://www.bop.gov/resources/news/20200313_covid-19.jsp.......5

5
Federal Bureau of Prisons, COVID-19 Coronavirus,
6       available at https://www.bop.gov/coronavirus/index.jsp......6, 7

7 Federal Bureau of Prisons, Home Confinement (Apr. 5, 2020),
        available at
8       https://www.bop.gov/resources/news/20200405_covid19_home_co
        nfinement.jsp...................................................7

9
Federal Bureau of Prisons, Statement from BOP Director (Mar. 26,
10      2020),
        available at
11      https://www.bop.gov/resources/news/20200326_statement_from_
        director.jsp...................................................4

12
Federal Bureau of Prisons, Update on COVID-19 (Mar. 24, 2020),
13      available at
        https://www.bop.gov/resources/news/pdfs/20200324_bop_press_
14      release_covid19_update.pdf.....................................5

15 Federal Bureau of Prisons, Updates to BOP COVID-19 Action Plan:
        Inmate Movement (Mar. 19, 2020),
16      available at
        https://www.bop.gov/resources/news/20200319_covid19_update.
17      jsp  ..........................................................3

18 Federal Bureau of Prisons, Memorandum to All Staff at FCC Lompoc
        from B. von Blanckensee, Acting Complex Warden, Subject:
19      Enhanced COVID-19 Mitigation Measures (April 17, 2020)......6, 7

20

21

22

23

24

25

26

27

28

1          **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.      INTRODUCTION**

3          It is unclear what relief defendant's motion seeks.  Decisions

4  regarding placement in home confinement are governed by 18 U.S.C.

5  § 3621(b), a provision that defendant does not cite.  Further, home

6  confinement decisions reside exclusively within the discretion of the

7  Bureau of Prisons ("BOP") and are unreviewable by this Court.  In

8  contrast, defendant cites to 18 U.S.C. § 3582, a provision governing

9  compassionate release, or permanent release from custody, a remedy

10  defendant does not seek.  Section 3582 does not govern decisions

11  regarding home confinement.

12          Regardless, defendant's motion should be dismissed.  Under the

13  statute governing decisions regarding home confinement, defendant's

14  motion for transfer to home confinement should be dismissed because

15  the Court lacks jurisdiction over the placement of inmates once they

16  are sentenced and in the custody of the Bureau of Prisons.  Under the

17  compassionate release statute, defendant's motion should be dismissed

18  because defendant has failed to comply with the mandatory exhaustion

19  requirements of 18 U.S.C. § 3582.  Even if the Court were to consider

20  defendant's request, defendant's criminal history and previous

21  release on home confinement for a prior federal offense show him to

22  be ill-suited to abide by any terms of home confinement.

23  **II.     STATEMENT OF FACTS**

24          **A.      Defendant's Crimes and Sentence**

25          Defendant conspired with co-defendants Jian Sheng Tan ("Tan")

26  and Hua Leung ("Leung") to launder money by providing a cashier's

27  check to a confidential source ("CS") in exchange for cash that

28

1    defendant believed was the proceeds of drug money.  In exchange,

2    defendant received a money laundering fee from the CS.

3         On August 18, 2017, defendant pled guilty pursuant to a plea

4    agreement to both counts of a two-count Indictment.  (PSR ¶ 1.)

5    Specifically, defendant was convicted of conspiring to launder

6    monetary instruments, in violation of 18 U.S.C. § 1956(h), and

7    laundering monetary instruments, in violation of 18 U.S.C.

8    § 1956(a)(3)(B).  (PSR ¶¶ 2, 3.)  On June 3, 2019, this Court

9    sentenced defendant to a custodial term of 36 months. (CR 263.)

10        According to the PSR, prior to the instant offense, defendant

11   had two prior federal fraud convictions, one out of this district.

12   The first was a wire fraud conviction pursuant to 18 U.S.C. § 1343

13   out of the district of Nevada.  (PSR ¶ 48.)  On December 4, 2000,

14   defendant was sentenced to three years' probation and six months of

15   home confinement.  (PSR ¶ 48) (emphasis added.)  In this district, in

16   2003, defendant was sentenced to three years' probation for pleading

17   guilty to violating 18 U.S.C. § 1014, false statement to a financial

18   institution.  (PSR ¶ 49.)  The instant offense is defendant's third

19   federal conviction for a financial fraud crime.

20        **B.    Incarceration and Projected Release Date**

21        Defendant is currently serving his sentence at Lompoc USP.

22   Defendant only began serving his three-year sentence on November 1,

23   2019.  His projected release date is May 21, 2022.  Thus, defendant

24   has served only a little over five months of his 36-month sentence.

25        **C.    Defendant's Current Motion**

26        On April 13, 2020, defendant sent a letter to the FCC Lompoc

27   Warden requesting a transfer to home confinement pursuant to the

28

2

1  CARES Act.  (Mot., Ex. 1.)  Defendant filed the instant motion three

2  days later, on April 16, 2020.

3      In his letter to the Warden, defendant argues that his remaining

4  term of incarceration should be transferred to home confinement

5  because he has a "history of coronary artery disease" with stent

6  placement in July 2019 after suffering a heart attack.  (Mot., Ex. 1,

7  at 1.)  He also advised of the medications he is currently taking,

8  including Plavix, aspirin and Atorvastatin.[1]  He further stated that

9  his condition necessitates an hour of exercise a day and a healthy

10 diet.  (Id.)  In addition to his letter, defendant included the

11 hospital records documenting his heart attack in July 2019, his one

12 night stay in the hospital, and his discharge instructions, including

13 medications.  (Mot., Ex. 2.)[2]  Defendant seeks home confinement based

14 on his stated increased risk for serious effects from the coronavirus

15 if infected.  (Mot. Ex. 1, at 1.)

16     **D.    The Bureau of Prisons' and Congress's Response to COVID-19**

17     BOP has taken aggressive steps to protect inmates' health and to

18 resist the spread of COVID-19.  "[M]aintaining safety and security of

19 BOP institutions is [the BOP's] highest priority."  BOP, Updates to

20 BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available

21 at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

22 Thus, the BOP Director recently emphasized that the "response [to

23 COVID-19] is the Bureau's top priority."  BOP, Statement from BOP

24 Director (Mar. 26, 2020) (Statement from BOP Director), available at

---

[1] It is government counsel's understanding that Plavix and aspirin are blood thinners, and Atorvastin treats high cholesterol.

[2] Some of these medical records contain redactions.

3

1   https://www.bop.gov/resources/news/20200326_statement_from_director.j

2   sp.

3        The BOP has never underestimated the threat of infectious

4   disease.  To the contrary, the BOP has had a Pandemic Influenza Plan

5   in place since 2012.  Id.; BOP, Pandemic Influenza Plan---Module 1:

6   Surveillance and Infection Control (Oct. 2012), available at

7   https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf.  That

8   protocol establishes a six-phase framework requiring BOP facilities

9   to begin preparations when there is first a "suspected human outbreak

10  overseas."  Id. at i (emphasis added).

11       At extremely early stages, the Pandemic Influenza Protocol

12  requires BOP facilities to ensure inmates' access to soap, to train

13  them on hand-hygiene practices, and to ensure adequate infection-

14  control supplies.  Id. at 9.  For every phase thereafter (from

15  preliminary preparation, to a response to active pandemic, to

16  recovery), it includes detailed procedures required of every BOP

17  facility.  Id. at 9-11.  These include policies for creating "social

18  distance" and for requiring "frequent environmental cleaning of

19  'high-touch' surfaces."  Id. at 2-3, 6.  Facilities must follow

20  protocols on how to identify sick inmates, track their interactions,

21  and quarantine the exposed.  Id. at 4-5.

22       The BOP implemented its Pandemic Influenza Protocol in January

23  2020, modified as a COVID-19 Action Plan.  BOP, Action Plan Phase V

24  (Mar. 31, 2020) ("Action Plan Phase V"), available at

25  https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp

26  In Phase 1 of that plan, the BOP began developing policies in

27  consultation with the Centers for Disease Control.  See BOP, COVID-19

28  Action Plan: Agency-Wide Modified Operations (March 13, 2020) ("BOP

4

1  Action Plan"), available at

2  https://www.bop.gov/resources/news/20200313_covid-19.jsp.

3       Since then, the BOP has serially escalated its response.  BOP,

4  Bureau of Prisons Update on COVID-19 (Mar. 24, 2020), available at

5  https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_co

6  vid19_update.pdf.  On March 13, the BOP moved to Phase 2 of its

7  Action Plan, taking steps to "mitigate the spread of COVID-19" in

8  prisons, for the protection of both inmates and staff.  See BOP

9  Action Plan, supra.  The BOP suspended social and legal visits,

10 curtailed inmate movement, established enhanced screening procedures

11 for inmates and staff, and curtailed staff travel.  Id.  Consistent

12 with the Pandemic Flu Protocol, facilities adopted "modified

13 operations"---including staggered meal and recreation times---to

14 promote social distancing.  Id.  Just five days later, the BOP

15 escalated to Phase 3--taking additional steps, including ensuring

16 that "all cleaning, sanitation, and medical supplies" had been

17 inventoried and were adequately stocked.  Id.

18      Phases 4 and 5 followed in late March; Phase 6 followed in mid-

19 April.  Beginning March 26, the BOP required all newly admitted

20 inmates to be quarantined or isolated for a minimum of 14 days "or

21 until cleared by medical staff."  See Action Plan Phase V, supra.  On

22 April 1, the BOP instituted a nationwide lockdown.  Id.  For at least

23 a two-week period, "inmates in every institution will be secured in

24 their assigned cells/quarters to decrease the spread of the virus."

25 Id.  The BOP has also "significantly decreas[ed] incoming movement.

26 Id.  Modified operations will continue, for all institutions, until

27 at least May 18, 2020.  Federal Bureau of Prisons, Bureau of Prisons

28 COVID-19 Action Plan: Phase Six (April 14, 2020), available at

1   https://www.bop.gov/resources/news/pdfs/20200414_press_release_action

2   _plan_6.pdf.

3       Meanwhile, the BOP has continued working with the CDC,

4   confirming that its approach aligns with current CDC guidance for

5   COVID management in correctional facilities.  Federal Bureau of

6   Prisons, Correcting Myths About BOP and COVID-19, at 1, available at

7   https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformat

8   ion_bop_covid19.pdf ("Correcting Myths").  Currently, BOP medical

9   staff are "conducting rounds and checking inmate temperatures at

10  least once a day"--twice a day where inmates are quarantined or in

11  isolation.  Id.  All BOP staff and inmates have been issued cloth

12  masks to wear on a daily basis--with staff required to wear masks,

13  gloves, and potentially gowns when dealing with isolated and

14  quarantined inmates.  Id. at 1, 3.  "Cleaning supplies have been

15  provided to inmates," and the BOP has provided training on CDC best

16  practices regarding disease transmission and prevention (including

17  sanitation).  Id. at 2.  Common areas are sanitized multiple times a

18  day.  Id. at 3.

19      The gravity and severity of these measures reflect BOP's

20  commitment to fighting COVID-19 and protecting inmates.  Nonetheless,

21  the BOP has not been immune from the pandemic.  At Lompoc, a total of

22  54 inmates and 27 staff members have been infected, with 1 inmate

23  death.  BOP, COVID-19 Coronavirus (updated daily at 12pm Pacific),

24  available at https://www.bop.gov/coronavirus/index.jsp (last visited

25  April 20, 2020).  But in response to this outbreak, the Bureau of

26  Prisons has instituted an aggressive set of protocols to reduce

27  further infections.  April 17, 2020 Memorandum re Enhanced COVID-19

28  Mitigation Measures (Exhibit 1).  Among other measures, the wearing

6

1    of BOP-provided masks is now mandatory for all inmates, each inmate

2    will have access to their disinfectant and paper towels, and use of

3    phones and computers without legal need is prohibited.  Id.

4        Infected inmates are isolated from fellow inmates and receive

5    medical treatment.  BOP, COVID-19 Coronavirus (updated daily at 12pm

6    Pacific), available at https://www.bop.gov/coronavirus/index.jsp.

7    "Inmates whose conditions cannot be managed within the institution

8    are sent to the local hospital[.]"  Correcting Myths, supra, at 6.

9    While inmate infection (and certainly death) at Lompoc are of concern

10   (and in the case of death, tragic), the numbers of infected inmates

11   should be considered low in light of Lompoc's total population in the

12   U.S. Penitentiary of at least 982 inmates.

13   **III. ARGUMENT**

14        **A.    The Bureau of Prisons Has Sole Authority to Determine**
              **Placement Decisions**

15

16        Defendant has requested that the Warden at Lompoc transfer him

     to home confinement to serve out the remainder of his 36-month
17
     sentence.[3]  Whatever decision the Warden reaches regarding
18
     defendant's request is not reviewable by courts.  See generally 18
19
     U.S.C. § 3621(b) (precluding judicial review of BOP placement
20
     decisions); Reeb v. Thomas, 636 F.3d 1224, 1226-28 (9th Cir. 2011)
21
     (courts lack jurisdiction to review BOP's placement decisions under
22

23   _____

24        [3] The BOP is "urgently reviewing all inmates" to determine their
     eligibility for home confinement, increasing resources to "review and
25   make appropriate decisions as soon as possible."  Federal Bureau of
     Prisons, Home Confinement (Apr. 5, 2020) ("BOP, Home Confinement"),
26   available at
     https://www.bop.gov/resources/news/20200405_covid19_home_confinement.
27   jsp.  Inmates "do not need to apply to be considered[.]"  Id. "The
     Department has also increased resources to review and make
28   appropriate determinations as soon as possible."  Correcting Myths,
     supra, at 6.

1   18 U.S.C. §§ 3622-24); United States v. Grass, 561 F. Supp. 2d 535,

2   537 (E.D. Pa. 2008) (same).

3        In fact, courts may not modify a sentence once it is imposed

4   unless expressly permitted by statute or Rule 35 of the Federal Rules

5   of Criminal Procedure.  United States v. Garza, 2020 WL 1485782*1

6   (S.D. Cal. March 27, 2020) citing United States v. Penna, 319 F.3d

7   509, 511 (9th Cir. 2003).  Rule 35 does not apply here, and the

8   provisions governing home confinement decisions vest authority over

9   the placement of inmates once they are sentenced solely with the

10  Bureau of Prisons.

11       All placement determinations, including placement on home

12  confinement, are made under 18 USC § 3621(b).  See 18 U.S.C.

13  § 3624(c)(6)(A); see also Sacora v. Thomas, 628 F.3d 1059, 1062 (9th

14  Cir. 2010).  As part of the First Step Act ("FSA"), the following

15  sentence was added to the end of paragraph § 3621(b):

16  "Notwithstanding any other provision of law, a designation of a place

17  of imprisonment under this subsection is not reviewable by any

18  court."  18 U.S.C. § 3621(b).  Even before the passage of the FSA,

19  the Ninth Circuit had ruled that a Court may not review the BOP's

20  discretionary placement decisions made pursuant to either §§ 3621 and

21  3624.  Reeb, 636 F.3d at 1226-28 (reviewing BOP's individualized

22  placement decisions would be contrary to the "plain language" of

23  § 3625 exempting such placement decisions from judicial review); see

24  also, Brown v. Sanders, 2011 WL 4899919, at *2 n.3 (C.D. Cal. Sept.

25  1, 2011) ("Although Reeb involved a determination regarding [RDAP] as

26  opposed to a CCC or home detention, the difference is immaterial as

27  the RDAP determination is also made pursuant to § 3621."), aff'd sub.

28  nom Brown v. Ives, 543 F. App'x 636 (9th Cir. 2013).  "While a judge

1  has wide discretion in determining the length and type of sentence,

2  the court has no jurisdiction to select the place where the sentence

3  will be served.  Authority to determine place of confinement resides

4  in the executive branch of government and is delegated to the Bureau

5  of Prisons." United States v. Ceballos, 671 F.3d 852, 855 (9th Cir.

6  2011) (citing United States v. Dragna, 746 F.2d 457, 458 (9th

7  Cir.1984) (per curiam) (citations omitted); see also United States v.

8  Williams, 65 F.3d 301, 307 (2d Cir.1995) (same).

9      Because Congress has exempted all BOP placement decisions,

10  including placement on home confinement, from judicial review, this

11  Court lacks jurisdiction to grant defendant's motion.  Accordingly,

12  defendant's motion should be dismissed.

13      **B.    Defendant Has Failed to Satisfy the Exhaustion Requirement
         Found in 18 U.S.C. § 3582**

14

15      A compassionate-release motion is a request for a permanent

16  reduction in a defendant's federal sentence.  Despite citing to 18

    U.S.C. § 3582, defendant has not sought such relief.  However, even

17
    assuming defendant had, a district court can evaluate a defendant's

18
    request for compassionate release only "after the defendant has fully

19
    exhausted all administrative rights" before the BOP, specifically:

20
        after the defendant has fully exhausted all administrative
21      rights to appeal a failure of the Bureau of Prisons to
        bring a motion on the defendant's behalf or the lapse of 30
22      days from the receipt of such a request by the warden of
        the defendant's facility, whichever is earlier[.]

23
    18 U.S.C. § 3582(c)(1)(A).  This requirement is mandatory and

24
    jurisdictional.  See generally Shaw v. Bank of America Corp., 946

25
    F.3d 533, 541 (9th Cir. 2019) ("statutorily-provided exhaustion

26
    requirements deprive the court of jurisdiction"); United States v.

27

28

9

1  Weidenhamer, No. CR016-01072-001-PHX-ROS, 2019 WL 6050264, at *2

2  (D. Az. Nov. 8, 2019) (citing cases).

3       Moreover, failure to exhaust cannot be excused.  As the Third

4  Circuit recently held, § 3582(c)(1)(A) "presents a glaring roadblock

5  foreclosing compassionate release at this point.  United States v.

6  Raia, --- F.3d ---, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020).

7  Given § 3582(c)(1)(A)'s plain language and purpose, the requirements

8  for filing a sentence reduction motion (had defendant in fact filed

9  such a motion), including that the defendant exhaust administrative

10 remedies or wait 30 days after filing a request with the warden, are

11 jurisdictional.

12      Exhaustion is particularly inexcusable for errors that an

13 administrative tribunal is competent to address.  Barron v. Ashcroft,

14 358 F.3d 674, 678 (9th Cir. 2004).  Indeed, "[g]iven BOP's shared

15 desire for a safe and healthy prison environment . . . strict

16 compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on

17 added--and critical--importance."  Raia, 2020 WL 1647922, at *2.

18 Here, the BOP is not merely competent to address defendant's

19 compassionate-release claims; it is uniquely qualified to do so.

20 Until the First Step Act, the BOP had exclusive authority to

21 adjudicate such claims.  Notably, the First Step Act did not change

22 the factors relevant to compassionate release, only the procedures by

23 which a defendant can raise such claims.  United States v. Ebbers,

24 --- F. Supp. 3d. ---, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020).

25 The BOP thus has immense expertise, both in (1) assessing the safety

26 and health of their inmates and (2) managing the administration of

27 their facilities.  Exhaustion cannot--but also should not--be

28 excused.  United States v. Eberhart, No. 13-CR-313-PJH-1,

10

1 | 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) (declining to excuse

2 | failure to exhaust COVID-19 compassionate-release motion); <u>Neman</u>, No.

3 | 14-521-JAK, ECF No. 863, at 6 (same).

4 |      Until 30 days have elapsed since defendant applied for

5 | compassionate release with BOP, this Court lacks authority to grant

6 | relief.  18 U.S.C. § 3582(c)(1)(1).  The Court should thus dismiss

7 | defendant's motion.

8         **C.    Defendant Should Serve His Full Sentence in Custody Given the Failure of a Previously Imposed Term of Home Confinement Did Not Prevent Defendant From Committing a New Crime and Any Condition Is Being Well-Managed While in Custody**

11 |      Even if the Court were to consider the motion, defendant's

12 | request should be denied because, contrary to defendant's assertion,

13 | defendant remains a danger to the community, and this danger

14 | outweighs any higher risk from coronary artery disease from which

15 | defendant may suffer in light of proper management of this condition

16 | while in custody.

17 |      BOP's release of inmates to home confinement must take into

18 | account, among other factors, the comparative risk to the inmate in

19 | home confinement in the identified location versus remaining in

20 | prison, the inmate's risk to the public through recidivism, and the

21 | availability of supervision during home confinement or risk to the

22 | public if supervision is lacking.  In balancing these competing

23 | factors, defendant should remain in custody.

24             1.    <u>Defendant Has a Significant Criminal History, Including a Term of Home Confinement that Did Not Dissuade Him From Committing Crime</u>

26 |      Defendant asserts that his conduct in prison proves that he is

27 | not a danger to the community.  (Mot., Ex. 1, at 2) ("...I have been

28 | an outstanding prisoner because I have made no mistakes or violating

1   [sic] any prison rules.").  But defendant's conduct in prison only

2   proves that when properly supervised in a custodial situation,

3   defendant can adhere to rules.  However, when supervision is non-

4   existent and defendant is merely confined to his home, he fails to

5   learn from his mistakes and continues to engage in serious, criminal

6   activity - activity that has resulted in three separate federal

7   convictions.

8               2.    Defendant's Condition Is Being Well-Managed

9        Defendant has provided hospital records only pertaining to his

10  one-night hospital stay for the heart attack he suffered in July

11  2019.  To the extent his heart attack was the result of coronary

12  artery disease, it is unclear whether defendant continues to suffer

13  from the disease.[4]

14       To the extent defendant has coronary artery disease, defendant

15  asserts without support that he cannot maintain regular exercise or a

16  healthy diet to control his disease while in custody.  BOP is

17  entitled to assess this claim administratively.  Further, it appears

18  that defendant's condition is well-managed by BOP.  As noted above,

19  defendant is currently on a regimen of blood thinners and cholesterol

20  medication that practically mirrors the medications prescribed to

21  defendant upon his release from the hospital in July 2019,[5] and these

22  _____

23      [4] This lack of clarity also demonstrates why BOP should have the
    opportunity to evaluate defendant's request first, before any motion
24  is considered by this Court.  BOP will have records associated with
    defendant's health while in custody that they can use to evaluate his
25  condition in light of his request.

        [5] Upon discharge from the hospital, defendant was prescribed the
26  following medications:  (1) aspirin (blood thinner); (2) Copidogrel,
    the generic form of Plavix (another blood thinner); (3) Atorvastatin
27  (to treat high cholesterol); and (4) Metoprolol Succinate (a beta
    blocker to treat chest pain and high blood pressure).  (Mot., Ex. 2,
28  at 15-16.)  Out of these, the only medication defendant is not
    receiving in custody is metoprolol succinate.

1   medications presumably lessen the severity of any coronary artery

2   disease from which he suffers.  The insertion of a stent back in July

3   2019 would have opened any blockage that existed that caused or

4   contributed to the heart attack.  Thus, it is not at all clear that

5   defendant is currently suffering from coronary artery disease that

6   places him at a higher risk of serious effects from COVID-19

7   infection.

8   **IV.   CONCLUSION**

9        Defendant's motion for home confinement or compassionate release

10  should be dismissed.  Even if the Court could reach the merits of

11  defendant's motion, the motion should be denied for the reasons set

12  forth above.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28